# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### November 19, 2002 Session

## STATE OF TENNESSEE v. REGINOL L. WATERS

### Direct Appeal from the Criminal Court for Davidson County
### No. 2000-C-1267      Steve R. Dozier, Judge

---

### No. M2001-02682-CCA-R3-CD - Filed January 30, 2003

---

A Davidson County jury convicted the defendant, Reginol L. Waters, of two counts of aggravated rape, one count of aggravated robbery, and one count of aggravated burglary. The trial court sentenced him as a Range I offender to twenty-three years for the first count of aggravated rape, twenty-five years for the second count of aggravated rape, ten years for aggravated robbery, and as a Range II offender to ten years for aggravated burglary. The trial court further ordered the two sentences for aggravated rape and the sentence for aggravated burglary be served consecutively and the sentence for aggravated robbery be served concurrently, for an effective sentence of fifty-eight years. In this appeal of right, the defendant raises the following issues: (1) whether the trial court erred in denying the motion to suppress testimony regarding the "showup" identification of the defendant; (2) whether the trial court erred in denying the motion to suppress the defendant's statements to the police; (3) whether the trial court erred in admitting the tape recording of the victim's telephone call to the police; (4) whether the state failed to establish a proper chain of custody for evidence found during a search of the defendant's vehicle; (5) whether the two convictions for aggravated rape should be merged; (6) whether the conviction for aggravated burglary violates due process because it was incidental to the offenses of aggravated rape and aggravated robbery; and (7) whether the sentences are excessive. Upon review of the record, we affirm the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

JOE G. RILEY, J., delivered the opinion of the court, in which DAVID H. WELLES and ALAN E. GLENN, JJ., joined.

Ross E. Alderman, Public Defender; Jeffrey A. DeVasher, Assistant Public Defender (on appeal); and J. Michael Engle, Assistant Public Defender (at trial), for the appellant, Reginol L. Waters.

Paul G. Summers, Attorney General and Reporter; Christine M. Lapps, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Brian Keith Holmgren, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

The victim, Leslie Beam, a college student, testified that on April 24, 2000, at approximately midnight, she heard someone outside her apartment. She thought it was her neighbor and walked outside. Instead, she saw the defendant standing outside of a storage closet; she re-entered her apartment. Later, she looked outside and saw the defendant sitting inside a green pickup truck parked in the parking lot of her apartment complex. Beam stated she and the defendant made eye contact, and she saw his face.

Beam testified that approximately two hours later, she heard a noise while she was in her living room watching a movie. She looked up and saw the defendant running down the hallway of her apartment toward her. Beam described him as a large black man with light freckles, wearing white clothing and a cloth across the bottom half of his face. The defendant was holding a knife with a serrated edge and flecks of white drywall or paint on it.

Beam stated the defendant threatened to hurt her if she screamed, stuffed a sock into her mouth, and wrapped masking tape around her head while pointing the knife at her throat. Beam pulled the sock out of her mouth and begged the defendant not to hurt her. Beam stated the defendant's cloth fell below his nose, and she saw his entire face above his mouth. The defendant demanded Beam give him all of her money, and when Beam went to get her purse, she ran for the door. The defendant re-captured her and again demanded money.

When Beam did not find any money in her wallet, she gave the defendant her debit card. Beam also wrote down her PIN number on a notice from her pet's veterinarian and gave it to the defendant. She pled with the defendant not to kill her. The defendant pulled the cloth down from his face, and she again saw his face before he pulled the cloth back over his nose.

Beam pulled away from the defendant, ran into the bathroom, and leaned over the toilet. Beam testified that she pretended to vomit because she thought the defendant would leave her alone. Instead, the defendant came into the bathroom and forced Beam down on her knees. He held a knife to her face and threatened to kill her if she did not perform oral sex on him. As Beam was performing oral sex on the defendant, she bit him and ran toward the door. Beam managed to unlock one of the locks on the door before the defendant seized her. Beam testified the defendant then grabbed the masking tape that was still around her neck, twisted it, and pulled it up until she could not breathe. The defendant repeatedly asked her why she had bitten him and struck her across her temple. Beam stated she again attempted to escape, but the defendant twisted the masking tape tighter until she was choking.

The defendant then pushed Beam on her back and straddled her. He placed his legs on Beam's shoulders and again forced her to perform oral sex on him. As he held a knife to her neck, the defendant threatened to kill her if she did not swallow, and he ejaculated into her mouth. She estimated that "maybe . . . five minutes" passed between the two fellatio incidents, but that "it felt like it was forever."

-2-

The defendant then demanded Beam tell him how to use the debit card. Beam testified the defendant pulled the cloth beneath his mouth, and she again saw his face before he pulled it over his nose. Beam attempted to escape, but the defendant pulled both of her arms behind her and again stuffed a sock into her mouth. The defendant tied Beam's hands behind her back with a scarf, tied the sock into her mouth with a pair of hose, and tied her ankles with her purse strap.

As Beam was tied up on the floor, the defendant looked around her apartment and grabbed her walkman. The defendant threatened to kill Beam, her family, and her friends if she called the police. He also threatened to come back and kill her if there was no money in her bank account; he then left. Beam testified the defendant was in her apartment for approximately twenty to twenty-five minutes. Beam called the police within a few minutes after the defendant left.

Sergeant Edwin Allen Groves testified that based upon Beam's description of her attacker, he apprehended the defendant, who was sitting in a green pickup truck parked in front of a SunTrust Bank. Officer James Pearce testified a "showup" was conducted at the scene where the defendant was apprehended, and Beam identified the defendant as her attacker. Officer Scott Cothran stated he searched the defendant's vehicle at the scene and found Beam's debit card, the knife, and the cloth the defendant wore on his face. Detective Keith Sutherland stated he later searched the vehicle and found the piece of paper on which Beam wrote her PIN number. Detective Sutherland and Officer Gene Martin testified they interviewed the defendant, who eventually confessed to committing the offenses.

The defendant testified at trial and denied confessing to the police officers. The defendant stated he had been on a crack cocaine binge for five days prior to April 24th. He said that on the evening of April 23rd, "Big Fred," a drug dealer, offered to sell the defendant drugs if the defendant would loan him his truck. Sometime after 10:00 p.m., Big Fred took the defendant's vehicle while the defendant went to an empty duplex to take the drugs.

The defendant testified that during the early morning of April 24th, Big Fred came back, but did not tell the defendant where he had been. As the defendant was entering the vehicle, Big Fred said he needed to go to a bank. While the defendant was driving the vehicle, he saw a debit card stuck in the visor, and Big Fred told him it belonged to either his sister or his girlfriend. According to the defendant, he parked the vehicle by SunTrust Bank, and Big Fred exited the vehicle. The defendant stated that when the patrol car parked behind his vehicle, Big Fred fled.

As stated, the jury convicted the defendant of two counts of aggravated rape, one count of aggravated robbery, and one count of aggravated burglary.

# I. SHOWUP IDENTIFICATION

The defendant contends the trial court erred in denying the motion to suppress Beam's identification testimony because the showup identification procedure was unnecessarily suggestive. The defendant further argues that under the totality of the circumstances, Beam's identification was unreliable. We disagree.

## A. Motion to Suppress

During the suppression hearing, Officer James Pearce testified he was one of the initial responding officers, arriving at Beam's apartment at approximately 2:30 a.m. to 2:45 a.m. Beam described her attacker to Officer Pearce as a light-skinned black man wearing white, "paint-spackled" clothing. Beam told the officer she had seen her attacker earlier outside her apartment in a green pickup truck. She further stated that during the attack, the perpetrator covered a portion of his face with a cloth and carried a knife with a four- to five-inch serrated blade that was "paint-spackled." Officer Pearce testified he communicated this information over the radio to other police officers shortly after his initial encounter with Beam.

Officer Pearce testified that at approximately 3:10 a.m., he was informed that a potential suspect, the defendant, had been located. The defendant had been found sitting in a green pickup truck by a SunTrust Bank approximately two miles from Beam's apartment. The defendant had been placed under arrest based upon a prior outstanding warrant. Officer Pearce and Detective Steve Cleek explained to Beam that a possible suspect was in custody and asked if she would make an identification.

Officer Pearce testified the showup occurred at 3:17 a.m., approximately one hour after the incident. The officers took the defendant out of the back of a patrol car and placed him beside the car. They shined a spotlight on the defendant so Beam could see him from the passenger window of the patrol car, which was parked ten to fifteen yards from the defendant. The defendant was wearing a white, paint-spackled t-shirt and white, paint-spackled painter's pants. Within "seconds" of viewing the defendant, Beam began shaking and said, "That's him, that's him. Oh, my God, don't let him get me. That's him."

The trial court found the showup identification procedure was reasonable and reliable. The trial court concluded that although the atmosphere was suggestive, Beam closely viewed the defendant prior to and during the incident, gave an accurate, detailed description of the defendant to the police officers, and immediately identified the defendant during the showup, which occurred approximately one hour after the incident.

## B. Analysis

Convictions based on eyewitness identification at trial following a pre-trial identification will be set aside if the identification was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Simmons v. United States, 390 U.S. 377, 384, 88 S. Ct. 967, 971, 19 L. Ed. 2d 1247, 1253 (1968). Although it may be suggestive, an identification may satisfy due process as reliable and admissible when considering the totality of the circumstances. *See* State v. Brown, 795 S.W.2d 689, 694 (Tenn. Crim. App. 1990). This court must consider five factors in determining whether the in-court identification is reliable enough to withstand a due process attack despite the suggestiveness of the pre-trial identification. Neil v. Biggers, 409 U.S. 188, 199, 93 S. Ct. 375, 382, 34 L. Ed. 2d 401, 411 (1972); State v. Strickland, 885 S.W.2d 85, 88 (Tenn. Crim. App. 1993). These factors are: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior

description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the time between the crime and the confrontation.  <u>Strickland</u>, 885 S.W.2d at 88 (citing <u>Neil</u>, 409 U.S. at 199).

A showup is an identification procedure that is, by its nature, inherently suggestive.  <u>State v. Thomas</u>, 780 S.W.2d 379, 381 (Tenn. Crim. App. 1989).  Courts have repeatedly condemned the use of a showup as a means of identifying a person suspected of committing a criminal offense. *See* <u>Stovall v. Denno</u>, 388 U.S. 293, 301, 87 S. Ct. 1967, 18 L. Ed. 2d 1199 (1968); <u>Wadley v. State</u>, 634 S.W.2d 658, 661 (Tenn. Crim. App. 1982).  However, the use of a showup may be warranted if (1) imperative circumstances necessitating the showup exist, or (2) the showup occurs as part of an on-the-scene investigatory procedure shortly after the commission of the crime.  <u>Thomas</u>, 780 S.W.2d at 381.  Further, even though the showup may be suggestive, it may be reliable and admissible under the totality of the circumstances.  <u>Brown</u>, 795 S.W.2d at 694.

In the case at bar, Beam's identification of the defendant during the showup was reliable under the totality of the circumstances.  Beam was able to view the defendant during the attack and recognized him as the man she saw earlier outside her apartment.  Beam was very close to the defendant during the attack and described in detail the events that occurred, the items he took, and the knife he was carrying.  Beam also gave a detailed description of her attacker and his vehicle.  During the showup, which occurred approximately one hour after the attack, Beam immediately identified the defendant as her attacker.  Therefore, we conclude the trial court properly denied the defendant's motion to suppress the identification testimony.


## II.  ADMISSIBILITY OF THE DEFENDANT'S STATEMENTS

The defendant contends the trial court erred in denying the motion to suppress his statements to the police.  We disagree.

During the suppression hearing, the parties stipulated that the defendant was arrested at approximately 3:00 a.m. on April 24th.  The defendant told Officer Cothran he had been taking drugs all night.  Officer Cothran transported the defendant to the homicide office of the police department where he, Detective Steve Cleek, and the defendant waited for Detective Keith Sutherland to arrive.  Both Officer Cothran and Detective Cleek testified that even though they did not read the defendant's *Miranda* rights to him, they did not ask him any questions.  They denied that the defendant requested counsel.

Detective Sutherland testified an affidavit of complaint was signed against the defendant at approximately 6:30 a.m., and he began interviewing the defendant at approximately 6:40 a.m.  The defendant had not been taken before a magistrate or booked into jail prior to the interrogation.  The detective described the defendant as "articulate" and stated he did not appear to be "inebriated or intoxicated."  Detective Sutherland further testified that although the defendant said he had been smoking crack cocaine for the past few days, there was no indication that the defendant was under the influence of drugs during the interrogation.

Detective Sutherland stated that the defendant read the *Miranda* form aloud; Sutherland read it back to the defendant; and the defendant then signed the waiver form. The defendant did not request an attorney or otherwise exercise his rights. The detective then met with the defendant for approximately one and a half hours.

During the recorded portion of the interview, the defendant told the officers he purchased drugs the prior evening from "Big Fred," who gave the defendant crack cocaine in exchange for the use of the defendant's truck. According to Detective Sutherland, the defendant then turned off the tape recorder and confessed to the offenses.

The defendant testified that prior to Detective Sutherland's interrogation, Officer Cothran and Officer Martin questioned him, and he refused to answer their questions. The defendant stated he asked to call an attorney or his parents, and the officers denied his request. The defendant said that while he was being taken to an interview room, he asked Detective Sutherland if he could call an attorney, and the officer denied his request.

The defendant testified he had been on a crack cocaine binge and had taken drugs ten minutes prior to his arrest. He stated he "thinks" he signed the waiver form, but did not read or understand it. The defendant explained that he signed it only because he was tired and had not slept in three to four days. He further denied making the unrecorded admissions to the officers.

The trial court found the defendant did not assert his right to counsel or his right to remain silent. It accredited the testimony of Officer Cothran and Detective Cleek, both of whom testified the defendant never invoked his rights and was never questioned prior to his interview with Detective Sutherland. The trial court further found the defendant knowingly and voluntarily waived his *Miranda* rights. It accredited the testimony of Detective Sutherland, who stated the defendant indicated he understood his rights and signed the waiver form after the detective explained it to him.

## A. Standard of Review

The findings of fact made by the trial court at the hearing on a motion to suppress are binding upon this court unless the evidence contained in the record preponderates against them. State v. Ross, 49 S.W.3d 833, 839 (Tenn. 2001). The trial court, as the trier of fact, is able to assess the credibility of the witnesses, determine the weight and value to be afforded the evidence and resolve any conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The application of the law to the facts found by the trial court are questions of law that this court reviews *de novo*. State v. Daniel, 12 S.W.3d 420, 423 (Tenn. 2000). The defendant has the burden of establishing that the evidence contained in the record preponderates against the findings of fact made by the trial court. Braziel v. State, 529 S.W.2d 501, 506 (Tenn. Crim. App. 1975).

## B. The Voluntariness of the Statements

The defendant first argues his admissions were involuntary due to his intoxication. We disagree.

When determining whether an accused has voluntarily, knowingly and intelligently waived his *Miranda* rights, this court must consider the totality of the circumstances which existed when the accused waived these rights. State v. Middlebrooks, 840 S.W.2d 317, 326 (Tenn. 1992); State v. Benton, 759 S.W.2d 427, 431 (Tenn. Crim. App. 1988). The totality of the circumstances must reveal "an uncoerced choice and the required level of comprehension." State v. Blackstock, 19 S.W.3d 200, 208 (Tenn. 2000) (quoting State v. Stephenson, 878 S.W.2d 530, 545 (Tenn. 1994)). Further, evidence of intoxication alone is insufficient to bar the admission of a defendant's statements if the evidence also indicates the defendant was capable of understanding his or her rights. State v. Bell, 690 S.W.2d 879, 882 (Tenn. Crim. App. 1985).

During the suppression hearing, Detective Sutherland testified that although the defendant stated he was under the influence of crack cocaine, there was no indication he was intoxicated. In addition, an examination of the detective's testimony and the tape recorded portion of the interrogation reveal that the defendant read the *Miranda* rights waiver form to the detective, and the detective then read the form back to the defendant. The defendant told Detective Sutherland he understood his rights and did not have any questions; the defendant then signed the waiver form. The trial court accredited the testimony of Detective Sutherland. The evidence does not preponderate against the findings of the trial court. This issue lacks merit.

## C. Right to Counsel

The defendant next contends the trial court erred in failing to suppress his admissions because he invoked his right to counsel during Detective Sutherland's interrogation. When a defendant clearly requests an attorney during custodial interrogation, all questioning must cease until an attorney is present, unless the defendant subsequently initiates further conversation with the authorities. Edwards v. Arizona, 451 U.S. 477, 484-85, 101 S. Ct. 1880, 1884-85, 68 L. Ed. 2d 378 (1981).

During the interview, Detective Sutherland asked the defendant if he wanted to call anyone to let them know where he was. The defendant stated that he did not. Although the tape recording is somewhat unclear, it appears the defendant did mention the words "call a lawyer." Detective Sutherland immediately asked the defendant if he wanted to call an attorney; there was no audible response on the recording. Questioning subsequently continued.

There is no written transcript of the recording. Although the lengthy recording was introduced into evidence, it was not played during the hearing. The trial court did indicate, however, that it would listen to the recording. Neither the defendant nor Detective Sutherland was questioned concerning this portion of the recording. We do not know what, if anything, the defendant did when asked if he wished to call an attorney. Further, the defendant's alleged request to Detective Sutherland for counsel during the 6:40 a.m. interview was not set forth as a basis for suppression in the defendant's written motion, nor did the defendant argue this as a basis for relief at the suppression hearing. The motion for new trial simply states that "[t]he defendant's unrecorded admissions to police interrogators should have been suppressed and, prior to its identification and authentication, it should not have been played to the Jury during the defendant's cross-examination." At the motion for new trial hearing, this portion of the recording was not argued. Thus, we conclude

this issue is raised for the first time on appeal. Under these circumstances, this issue is waived. *See* Tenn. R. App. P. 36(a). Furthermore, in light of the state of the record, we envision no plain error. *See* State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (noting the record must be clear in order for plain error to be found).

In addition, we conclude that even if the admission of the defendant's statements were error, it was harmless beyond a reasonable doubt in light of the overwhelming evidence of the defendant's guilt. *See* Arizona v. Fulminante, 499 U.S. 279, 299, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991) (applying harmless error analysis to the admission of an involuntary confession); State v. Dean, 76 S.W.3d 352, 371 (Tenn. Crim. App. 2001) (finding harmless error in the erroneous admission of defendant's confession).

## D. Tennessee Rule of Criminal Procedure 5(a)

The defendant argues the trial court erred in denying his motion to suppress his admissions because he was not taken before a magistrate without unnecessary delay. The defendant submits the police delayed the hearing in order to gather additional evidence justifying his arrest, including his confession. We disagree.

Tennessee Rule of Criminal Procedure 5(a) provides that "[a]ny person arrested except upon a capias pursuant to an indictment or presentment shall be taken without unnecessary delay before the nearest appropriate magistrate of the county from which the warrant for arrest issued. . . ." Tenn. R. Crim. P. 5(a). However, a violation of Rule 5(a) does not necessarily lead to the suppression of the confession. *See* Middlebrooks, 840 S.W.2d at 327-28. When there is a Rule 5(a) violation, the "unreasonable delay" is but one factor to be taken into account in evaluating the voluntariness of the confession. *See* State. v. Huddleston, 924 S.W.2d 666, 670-71 (Tenn. 1996). If the totality of the surrounding circumstances indicates that a confession was voluntarily given, it shall not be excluded from evidence solely because of the delay in carrying the defendant before a magistrate. *Id.* at 671; State v. Readus, 764 S.W.2d 770, 774 (Tenn. Crim. App. 1988).

The court must also determine whether the Fourth Amendment requires suppression. Dean, 76 S.W.3d at 361. The United States Supreme Court has determined that the Fourth Amendment requires a prompt judicial determination of probable cause after a warrantless arrest. Gerstein v. Pugh, 420 U.S. 103, 125, 95 S. Ct. 854, 869, 43 L. Ed. 2d 54 (1975). The holding in Gerstein was later clarified by the court by stating that judicial determinations of probable cause are generally to be made within forty-eight hours of the arrest. County of Riverside v. McLaughlin, 500 U.S. 44, 56, 111 S. Ct. 1661, 1670, 114 L. Ed. 2d 49 (1991).

In the case at bar, the defendant was taken into custody at approximately 3:00 a.m. on April 24th on an unrelated outstanding warrant. The police officers then conducted a showup and searched the defendant's vehicle. Officer Cothran made arrangements for the defendant's vehicle to be towed. After following the tow truck to the police department's identification building, Officer Cothran took the defendant to the homicide office. Arrest warrants were issued against the defendant at approximately 6:30 a.m., and Detective Sutherland began interviewing the defendant at 6:40 a.m. Detective Sutherland testified he did not know when he relinquished custody of the defendant, but

he interrogated the defendant for one to one and a half hours. Even though the exact time the defendant was taken before the magistrate is unclear from the record, it was apparently around 10:45 a.m.

In summary, the defendant was taken into custody at approximately 3:00 a.m.; arrest warrants were secured at approximately 6:30 a.m.; the defendant's interrogation began at approximately 6:40 a.m. and lasted one to one and a half hours; and the defendant appeared before the magistrate at approximately 10:45 a.m. Based upon our review of the record, we conclude there was no Rule 5(a) violation nor Fourth Amendment violation.

We note that even if Rule 5(a) were violated, the suppression of the defendant's admissions would not be required. *See* Huddleston, 924 S.W.2d at 671. The defendant, a high school graduate with an extensive criminal record, was interrogated for a relatively short period of time, confessed within hours of his arrest, and, as discussed above, voluntarily waived his *Miranda* rights. The totality of the surrounding circumstances indicate the defendant voluntarily gave the confession. Further, even if there were a Fourth Amendment violation, the defendant's confession was admissible due to the presence of *Miranda* warnings, the short period of time between the arrest and the confession, and the lack of flagrancy of official misconduct. *See id*. at 674-75 (holding a Fourth Amendment violation does not require suppression when the state establishes the confession "was sufficiently an act of free will" after considering (1) the presence of absence of *Miranda* warnings; (2) the temporal proximity of the arrest and the subsequent confession; (3) the presence of intervening circumstances; and (4) the purpose and flagrancy of the official misconduct). Finally, as previously stated, any error regarding the admission of the defendant's confession was harmless beyond a reasonable doubt in light of the overwhelming evidence of the defendant's guilt. *See* Dean, 76 S.W.3d at 371.

### III.  TAPE RECORDING OF THE VICTIM'S TELEPHONE CALL

The defendant contends the trial court erred in admitting the tape recording of the victim's telephone call to the police. We disagree.

Beam testified she called the police a "few minutes" after the defendant left her apartment. According to the tape recording of the telephone conversation, Beam placed the call at 2:23 a.m. She was noticeably upset and crying. During the telephone call, she described her attacker and gave certain details relating to the offenses.

During a jury-out hearing, the trial court found the tape recorded statements were relevant to the description of the attacker and the time of the attack. The trial court also found the recorded statements were admissible under the excited utterance exception to the hearsay rule. *See* Tenn. R. Evid. 803(2).

## A. Hearsay

The trial court has broad discretion in determining whether a statement is hearsay and whether an exception applies, and its decision will not be disturbed on appeal absent a clear abuse of that discretion. State v. Stout, 46 S.W.3d 689, 697 (Tenn. 2001).

Under the "excited utterance" exception to the hearsay rule, a statement "relating to a startling event or condition made while the declarant is under the stress of excitement caused by the event or condition" is admissible at trial. Tenn. R. Evid. 803(2). In order for this exception to apply, three requirements must be met: (1) there must be a startling event or condition; (2) the statement must "relate to" the startling event or condition; and (3) the declarant must have made the statement while under the stress or excitement of the event or condition. Stout, 46 S.W.3d at 699-700. The telephone call clearly meets the requirements of the excited utterance exception to the hearsay rule.

## B. Rule 403

The defendant submits the tape recording's probative value is outweighed by the danger of unfair prejudice. Tennessee Rule of Evidence 403 provides, in part, that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, . . . or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. This rule places a heavy burden on the party seeking to exclude the evidence. State v. James, 81 S.W.3d 751, 757 (Tenn. 2002).

The tape recording of Beam's telephone call to police was probative as to the description of the attacker and the exact time of the attack, both of which were issues at trial. Further, it was not unnecessarily cumulative. The danger of unfair prejudice did not substantially outweigh the probative value of the tape recording. *See* Tenn. R. Evid. 403.

## IV. CHAIN OF CUSTODY

The defendant contends the trial court erred in admitting evidence obtained from a search of his vehicle two days after his arrest because the state failed to establish a proper chain of custody regarding the vehicle. We disagree.

In order to admit physical evidence, the party offering the evidence must either introduce a witness who is able to identify the evidence or must establish an unbroken chain of custody. State v. Holbrooks, 983 S.W.2d 697, 700 (Tenn. Crim. App. 1998). Whether the required chain of custody has been sufficiently established to justify the admission of evidence is a matter committed to the sound discretion of the trial court, and the court's determination will not be overturned in the absence of a clearly mistaken exercise of that discretion. *Id.* at 701.

During the trial, Detective Sutherland testified he learned from Beam that the defendant took a debit card, a walkman, and a veterinarian appointment notice on which Beam wrote the PIN

number of the debit card. He stated that two days after the defendant was arrested, he searched the defendant's vehicle at the tow-in lot. He further stated he was looking for the walkman, which had not yet been recovered, and instead, found the slip of paper with Beam's PIN number written on it. Defense counsel objected, arguing chain of custody of the vehicle at the time it was in the tow-in lot had not been established.

Detective Sutherland testified the truck was initially taken to the identification section of the police department to be processed, and it was then taken to a tow-in lot, which was owned and operated by the police department. The detective then stated that while the vehicle was at the tow-in lot, he searched it and found the slip of paper with Beam's PIN number; however, he did not find the walkman.

Defense counsel showed the detective a photograph of the cab of the truck, which was taken by the identification section during processing. Detective Sutherland stated that even though the walkman was in the photograph, he did not find it when he searched the vehicle two days later. Defense counsel then objected to the admission of the slip of paper arguing the police did not maintain exclusive custody of the truck. The trial court noted the prosecution had not moved to introduce the slip of paper into evidence.

Detective Sutherland testified he gave the slip of paper to the property room personnel, but the paper was now missing. During redirect, the prosecution entered the property evidence report listing the slip of paper into evidence. The detective also identified the slip of paper in a photograph of the interior of the vehicle, which was taken by the identification section during processing and had previously been entered into evidence. Defense counsel made no other objections.

We envision no chain of custody problem. The photographs were taken at the identification building a short time after the defendant was arrested and were properly identified at trial. Detective Sutherland's testimony regarding his observations during a search conducted two days later does not violate the chain of custody requirement.

## V.  MERGER OF THE AGGRAVATED RAPE CONVICTIONS

The defendant contends the trial court erred in failing to merge the two convictions for aggravated rape because the evidence established one continuing offense of aggravated rape by fellatio. The defendant submits the separate convictions violate double jeopardy principles. We respectfully disagree.

The constitutional right against double jeopardy protects against (1) a second prosecution after an acquittal; (2) a second prosecution after a conviction; and (3) multiple punishments for the same offense. State v. Beauregard, 32 S.W.3d 681, 682 (Tenn. 2000). The present issue concerns the third category of protections.

Multiplicity involves the creation of several offenses from a single offense. State v. Phillips, 924 S.W.2d 662, 665 (Tenn. 1996). In determining whether offenses are multiplicitous, we note the following principles:

> 1. A single offense may not be divided into separate parts; generally, a single wrongful act may not furnish the basis for more than one criminal prosecution;
>
> 2. If each offense charged requires proof of a fact not required in proving the other, the offenses are not multiplicitous; and
>
> 3. Where time and location separate and distinguish the commission of the offenses, the offenses cannot be said to have arisen out of a single wrongful act.

*Id.* (citations omitted).

In addition, in cases involving sexual offenses, the following factors are also significant:

> 1. The nature of the act;
>
> 2. The area of the victim's body invaded by the sexually assaultive behavior;
>
> 3. The time elapsed between the discrete conduct;
>
> 4. The accused's intent, in the sense that the lapse of time may indicate a newly formed intent to again seek sexual gratification or inflict abuse; and
>
> 5. The cumulative punishment.

*Id.* The issue of multiplicity is not determinative upon the presence or absence of one or more factors other than the nature of the act. *Id.*

Although separate acts of intercourse may be so related to amount to one criminal offense, rape is generally not considered one continuous offense; rather, each act of intercourse is a separate and distinct offense. *Id.* at 664. Further, each act can produce its own "attendant fear, humiliation, pain, and damage to the victim." *Id.* at 665.

The defendant in the case at bar was convicted of two counts of aggravated rape. "Aggravated rape," as applicable to this case, is the

> unlawful sexual penetration of a victim by the defendant or the defendant by a victim . . . [and] . . . [f]orce or coercion is used to

-12-

> accomplish the act and the defendant is armed with a weapon or any article used or fashioned in a manner to lead the victim reasonably to believe it to be a weapon.

Tenn. Code Ann. § 39-13-502(a)(1). "Sexual penetration" includes "fellatio," and the "emission of semen is not required." Tenn. Code Ann. § 39-13-501(7).

The issue of multiplicity in cases involving sexual offenses is often difficult to resolve. For example, in Phillips, the defendant inserted a plastic object into the victim's vagina, performed cunnilingus, and forced her to engage in vaginal intercourse; the defendant was properly convicted of three separate counts of aggravated rape. Phillips, 924 S.W.2d at 663-64. The Tennessee Supreme Court held the defendant committed three separate offenses; the sexual acts, which expended approximately three hours, required different body positions and body parts. *Id.* at 665.

In State v. Kendrick, 38 S.W.3d 566, 569 (Tenn. 2001), the defendant was convicted of two counts of aggravated rape for forcing the victim to perform fellatio on him and forcing her to engage in vaginal intercourse five to ten minutes later. The Tennessee Supreme Court applied the Phillips factors and concluded the defendant committed two separate and distinct offenses. *Id.* In the recent case of State v. Eddie Medlock, No. W2000-03009-CCA-R3-CD, 2002 Tenn. Crim. App. LEXIS 41, *12 (Tenn. Crim. App. Jan. 16, 2002, at Jackson), *perm. to app. denied* (Tenn. 2002), this court concluded the evidence established two separate and distinct acts of vaginal sexual penetration, one with a coat hanger and one penile. The court reasoned that each act was of a different nature and occurred in different rooms of the apartment "more than a few minutes" apart. *Id.*

However, in State v. Adrian Arnett, No. 03C01-98110-CR-00395, 2000 Tenn. Crim. App. LEXIS 84, at *21 (Tenn. Crim. App. Feb. 2, 2000, at Knoxville), *aff'd*, 49 S.W.3d 250 (Tenn. 2001), this court merged the defendant's two convictions for aggravated rape, holding the separate convictions violated double jeopardy principles. The conduct involved two acts of vaginal penetration, one digital and one penile which occurred only "seconds" apart. *Id.* at *20. The court noted that the evidence showed the digital penetration was the means by which the defendant accomplished the penile penetration. *Id.* at *21.

Similarly, in State v. Michael D. Evans, No. 03C01-9703-CR-00104, 1997 Tenn. Crim. App. LEXIS 1240, at **11-12 (Tenn. Crim. App. Dec. 9, 1997, at Knoxville), the court concluded two of the defendant's convictions for rape of a child involving two acts of vaginal penetration violated the principles of double jeopardy. The actions invaded the same area of the victim's body, were of the same nature, and occurred seconds apart. *Id.* at *12.

After examining the record and applicable law, we conclude the defendant's conduct constituted two separate and distinct offenses of aggravated rape. Unquestionably, the nature of the act and the area of the victim's body that was invaded were the same in both instances, weighing in favor of a double jeopardy finding. However, the acts of sexual penetration occurred approximately five minutes apart. *See* State v. Barney, 986 S.W.2d 545, 550 (Tenn. 1999) (upholding dual convictions for child rape and aggravated sexual battery where "the acts, although close in time, were not performed simultaneously"). The first act of fellatio was abruptly terminated

when the victim bit the defendant and escaped. Beam testified that during the next five minutes, she ran from the bathroom, where the first act of sexual penetration occurred, to the living room; there she managed to unlock one lock on the door before the defendant caught her; using the tape that was still around her neck, the defendant pulled Beam away from the door, choked her, hit her, and yelled at her; they struggled with the knife; Beam made another failed attempt to escape; the defendant then forced her on her back, a different position than previously; the defendant straddled her, thus assuming a different position than previously; and the defendant forced her to perform another act of fellatio until he ejaculated. Under the circumstances, each act of forced fellatio was capable of producing its own "fear, humiliation, pain, and damage to the victim." *Id.* (quoting Phillips, 924 S.W.2d at 665). Furthermore, unlike the acts in Adrian Arnett and Michael D. Evans, the acts of sexual penetration in the instant case did not occur "seconds" apart. *See* Adrian Arnett, 2000 Tenn. Crim. App. LEXIS 84, *20; Michael D. Evans, 1997 Tenn. Crim. App. LEXIS 1240, at *12.

In contending the two convictions should be merged, the defendant cites State v. Pelayo, 881 S.W.2d 7 (Tenn. Crim. App. 1994). In that case, the defendant entered the victim's apartment, threatened her with a knife, and cut her arm. *Id.* at 9. When the victim ran outside her apartment, the defendant caught up to her and cut her leg. *Id.* On appeal, this court merged the defendant's two convictions for aggravated assault, holding the separate convictions violated double jeopardy principles. *Id.* at 13.

However, Pelayo is distinguishable from the case at bar. In Pelayo, the defendant was convicted of two counts of aggravated assault, while in the instant case, the defendant was convicted of two counts of aggravated rape. The Pelayo court noted that rape cases may be distinguished because "the gravaman of the rape statute is 'penetration' while the gravaman of the aggravated assault statute is injury, fear, or physical contact." *Id.* at 11; *see* Tenn. Code Ann. §§ 39-13-102(a) (aggravated assault), -502(a) (aggravated rape).

Further, in State v. Johnson, the Tennessee Supreme Court distinguished the offense of sexual battery, which requires sexual contact, from rape, which requires penetration. 53 S.W.3d 628, 632 (Tenn. 2001); *see* Tenn. Code Ann. §§ 39-13-502(a) (aggravated rape), -505(a) (sexual battery). The court noted that unlike the definition of penetration, the definition of sexual contact "does not contain physical acts of sexual contact listed separately and alternatively." Johnson, 53 S.W.3d at 632 (citations omitted); *see* Tenn. Code Ann. § 39-13-501(6), (7). The court stated the language used to define sexual battery resembles the language used to define aggravated assault in Pelayo and concluded that "the sexual battery statute is aimed at preventing sexual contact which may consist of more than one touch." Johnson, 53 S.W.3d at 632.

In contrast, the aggravated rape statute focuses on the act of "sexual penetration." *See* Tenn. Code Ann. § 39-13-502(a). Unlike the element of imminent fear in the aggravated assault statute, the state can produce evidence as to when one penetration ends and another begins. In the present case, the evidence shows the defendant forced Beam to perform fellatio on him in her bathroom; that act was terminated. Beam escaped to another room in her apartment. The parties struggled for the knife, and Beam again attempted to escape. The defendant then again forced Beam to perform fellatio on him until he ejaculated. We conclude the time that elapsed between the two penetrations and the intervening events during this time show the defendant developed "a newly formed intent

to again seek sexual gratification or inflict abuse." *See* Phillips, 924 S.W.2d at 665. The defendant's actions constituted two separate and distinct offenses of aggravated rape.

We do note that the trial court ran the sentences for the two counts of aggravated rape consecutively, thereby resulting in cumulative punishment. However, we find nothing to indicate that the legislature did not intend for cumulative punishment to be imposed when a defendant commits separate and distinct acts of aggravated rape. *See* Barney, 986 S.W.2d at 550 (upholding cumulative punishment due to "frequency and pervasiveness of the abuse of this victim").

## VI. ANTHONY ISSUE

The defendant contends the offense of aggravated burglary was essentially incidental to the offenses of aggravated rape and aggravated robbery. He relies on State v. Anthony, 817 S.W.2d 299 (Tenn. 1991), and submits his conviction for aggravated burglary violates due process of law. We disagree.

In Anthony, the Tennessee Supreme Court held that a conviction for kidnapping and armed robbery growing out of a single episode could not be sustained where the kidnapping was essentially incidental to the accompanying robbery. 817 S.W.2d at 307. The armed robbery offense in that case inherently and necessarily proved the elements of the kidnapping offense. *Id.* at 303.

Our state supreme court has been reluctant to apply Anthony outside the kidnapping context. *See* State v. Ralph, 6 S.W.3d 251, 256 (Tenn. 1999) (holding due process was not violated by dual convictions for burglary and theft); Barney, 986 S.W.2d at 548 (holding the analysis in Anthony "is not helpful in the context of sexual offenses"). Likewise, we decline to extend Anthony to include separate convictions for aggravated rape, aggravated robbery, and aggravated burglary.

Each of these offenses is narrowly defined by statute and contains different elements. Aggravated rape is a crime against a person requiring unlawful sexual penetration accomplished by force or coercion and a weapon. Tenn. Code Ann. § 39-13-502(a)(1). Aggravated robbery, a crime against a person, involves theft from the person by violence or fear through the use of a deadly weapon. *Id.* §§ 39-13-401(a), -402(a)(1). Aggravated burglary is a property offense, which may be completed upon entry into the habitation with the intent to commit a felony, theft or assault. *Id.* §§ 39-14-402(a)(1), -403(a). Each of these offenses may be committed without committing the others.

Therefore, we conclude the separate convictions for aggravated rape, aggravated robbery, and aggravated burglary do not violate due process.

## VII. SENTENCING

The defendant contends his sentences of twenty-three and twenty-five years on the two counts of aggravated rape and ten-year sentence for aggravated burglary are excessive. In addition,

-15-

the defendant submits the trial court erred in imposing partial consecutive sentences. He does not contest his sentence for aggravated robbery.

A defendant's sentence is reviewed by the appellate courts *de novo* with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d); State v. Imfeld, 70 S.W.3d 698, 704 (Tenn. 2002). For this presumption to apply to the trial court's actions, there must be an affirmative showing in the record that the trial court considered sentencing principles and all relevant facts and circumstances. State v. Pettus, 986 S.W.2d 540, 543-44 (Tenn. 1999).

In the case at bar, the trial court sentenced the defendant as a Range I offender to twenty-three years for the first count of aggravated rape, twenty-five years for the second count of aggravated rape, ten years for aggravated robbery, and ten years as a Range II multiple offender for aggravated burglary. The trial court ordered the two sentences for aggravated rape and the sentence for aggravated burglary be served consecutively and the sentence for aggravated robbery be served concurrently, for an effective sentence of fifty-eight years.

In determining the sentences for the two convictions for aggravated rape, Class A felonies, the trial court properly began at the midpoint of the range, which was twenty years. *See* Tenn. Code Ann. § 40-35-210(c). The trial court properly began at the minimum sentence for the aggravated robbery conviction, a Class B felony. *Id.* The defendant conceded he was a Range II multiple offender regarding the conviction for aggravated burglary, and the trial court began at the minimum sentence. *See id.* The trial court then applied statutory enhancement factors to each offense; it found no mitigating factors.

The trial court applied the following statutory enhancement factors to the convictions for aggravated rape and aggravated burglary:

> (1) The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range;
>
> (5) The defendant treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense;
>
> (6) The personal injuries inflicted upon . . . the victim [were] particularly great;
>
> (7) The offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement;
>
> (8) The defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community;

(10) The defendant had no hesitation about committing a crime when the risk to human life was high; and

(16) The crime was committed under circumstances under which the potential for bodily injury to a victim was great.

Tenn. Code Ann. § 40-35-114. Regarding the aggravated burglary conviction, the trial court also applied enhancement factor (9), "[t]he defendant possessed or employed a . . . deadly weapon during the commission of the offense." *Id*. at (9).

## A. Application of Enhancement Factors

The defendant contends the trial court improperly applied enhancement factors (5), (6), (7), (10), and (16) to his convictions for aggravated rape and aggravated burglary. The defendant does not contest the application of enhancement factors (1), (8), and (9). He does not contest his sentence for aggravated robbery.

## 1. Enhancement Factor (5)

The defendant submits the trial court erred in its application of enhancement factor (5), "[t]he defendant treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense." Tenn. Code Ann. § 40-35-114(5). We disagree.

In order for enhancement factor (5) to apply, the court must find a defendant treated a victim with cruelty "over and above" what is required to sustain a conviction for an offense. State v. Arnett, 49 S.W.3d 250, 258 (Tenn. 2001). However, unlike Arnett, where the same facts established both exceptional cruelty and the elements of aggravated rape, the defendant's conduct in the case at bar went above and beyond that which was necessary to sustain the convictions. The defendant bound and gagged Beam; Beam was unable to breathe on at least two occasions; he cut and scraped her with a knife on various areas of her body; Beam sustained severe carpet burns as a result of her failed attempts to escape; and the defendant subjected Beam to prolonged abuse, which continued for approximately twenty minutes. We conclude the trial court properly applied enhancement factor (5) to the convictions for aggravated rape and aggravated burglary. *See* State v. Alvarado, 961 S.W.2d 136, 151 (Tenn. Crim. App. 1996) (holding enhancement factor (5) applied to the defendant's convictions for aggravated rape and aggravated burglary when he held a knife to the victim's throat, bit her, stabbed her, and attempted to smother her).

## 2. Enhancement Factor (6)

The defendant contends the trial court erred in applying enhancement factor (6), "[t]he personal injuries inflicted upon . . . the victim [were] particularly great." Tenn. Code Ann. § 40-35-114(6). We disagree.

The "personal injuries" addressed in enhancement factor (6) include physical, psychological, and emotional injuries. Arnett, 49 S.W.3d at 260. The state must present "specific and objective"

-17-

evidence demonstrating the victim's mental injury is "particularly great" as compared to the mental injuries which normally result from the offense. *Id.*

During the sentencing hearing, Beam testified she was unable to stay at her apartment after the assault. She continues to suffer from vivid nightmares and goes to sleep believing someone is in her home. Beam received treatment from a counselor, a psychologist, and a trauma therapist. She is still under the care of the psychologist and the therapist and continues to take anti-depressants. We conclude the evidence sufficiently established that Beam suffered psychological injuries beyond those which normally result from the offenses. Therefore, the trial court properly applied enhancement factor (6) to the convictions for aggravated rape and aggravated burglary.

### 3. Enhancement Factor (7)

The defendant argues the trial court erred in applying enhancement factor (7), "[t]he offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement." Tenn. Code Ann. § 40-35-114(7). We disagree.

Enhancement factor (7) requires an examination of the defendant's motive for committing the offense. State v. Kissinger, 922 S.W.2d 482, 490 (Tenn. 1996). In rape cases, the state may prove the defendant's motivation to seek pleasure or excitement through evidence of "sexually explicit remarks and overt sexual displays made by the defendant . . . or remarks or behavior demonstrating the defendant's enjoyment of the sheer violence of the rape." Arnett, 49 S.W.3d at 262. However, evidence of ejaculation alone is insufficient to support an application of enhancement factor (7). Kissinger, 922 S.W.2d at 490.

In the case at bar, the defendant repeatedly told Detective Sutherland he thought Beam was attractive. He stated he wanted to know her name, and upon entering her apartment, he searched through her possessions for evidence of her name. The evidence also shows that the defendant, after the first act of forced fellatio was abruptly terminated prior to the defendant's reaching his sexual fulfillment, again forced Beam to perform fellatio, ejaculated into her mouth, and forced her to swallow. The evidence sufficiently demonstrates the defendant committed the offenses in order to gratify his desire for pleasure or excitement. The trial court properly applied enhancement factor (7) to the convictions for aggravated rape and aggravated burglary.

### 4. Enhancement Factor (10)

The defendant contends the trial court erred in applying enhancement factor (10), "[t]he defendant had no hesitation about committing a crime when the risk to human life was high." Tenn. Code Ann. § 40-35-114(10). We agree with this contention.

Enhancement factor (10) is not an element of aggravated rape committed while in possession of a weapon. State v. Spratt, 31 S.W.3d 587, 608 (Tenn. Crim. App. 2000). However, this factor may be applied only when the use of the weapon involves a greater risk than that required by the standards of the aggravated offenses. *Id.*

In the case at bar, the defendant possessed a deadly weapon, a knife, and Beam received minor cuts and scrapes from the knife. However, despicable as the defendant's conduct was, we cannot conclude that the defendant's conduct involved a high risk to human life. Therefore, we conclude the trial court erred in applying enhancement factor (10) to the convictions for aggravated rape and aggravated burglary.

### 5. Enhancement Factor (16)

The defendant submits the trial court erred in applying enhancement factor (16), "[t]he crime was committed under circumstances under which the potential for bodily injury to a victim was great." Tenn. Code Ann. § 40-35-114(16). We disagree.

Whenever an offender commits aggravated rape, the potential for bodily injury to a victim is great; therefore, a trial court should apply enhancement factor (16) only under extraordinary circumstances. Spratt, 31 S.W.3d at 608-609 (citations omitted). Here, the defendant not only possessed the deadly weapon, but he also used it to inflict cuts and scrapes on the victim. *See* Tenn. Code Ann. § 39-11-106(a)(2) (defining "bodily injury" to include "a cut" or "abrasion"). Further, the defendant was not prosecuted under the "bodily injury" portion of the aggravated rape statute. *See* Tenn. Code Ann. § 39-13-502(a)(2). Thus, bodily injury was not an element of that offense. We conclude the trial court did not err in its application of enhancement factor (16) to the convictions for aggravated rape and aggravated burglary.

### 6. Effect on the Defendant's Sentences

The wrongful application of one or more enhancement factors by the trial court does not necessarily lead to a reduction in the length of the sentence. State v. Winfield, 23 S.W.3d 279, 284 (Tenn. 2000). This determination requires that we review the evidence supporting any remaining enhancement factors, as well as the evidence supporting any mitigating factors. Imfeld, 70 S.W.3d at 707.

Only one enhancement factor was improperly applied. The trial court properly found no mitigating factors applied. The applicable enhancement factors for each conviction are entitled to great weight. Therefore, we conclude the erroneous application of one enhancement factor does not warrant a reduction in the defendant's sentences.

## B. Consecutive Sentencing

The defendant contends the trial court erred in imposing partial consecutive sentences. We disagree.

A court may order sentences to run consecutively if the court finds by a preponderance of the evidence that:

> . . .

(2) [t]he defendant is an offender whose record of criminal activity is extensive; [or]

. . .

(4) [t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high[.]

Tenn. Code Ann. § 40-35-115(b)(2), (4); *see also* Imfeld, 70 S.W.3d at 708. Furthermore, in the event the trial court finds the defendant is a "dangerous offender," it must also determine whether the consecutive sentences (1) are reasonably related to the severity of the offenses committed; and (2) serve to protect the public from further criminal conduct by the offender. State v. Wilkerson, 905 S.W.2d 933, 939 (Tenn. 1995).

The trial court ordered the defendant's sentences for the two convictions of aggravated rape and one conviction for aggravated burglary run consecutively. The trial court found the defendant was "an offender whose record of criminal activity is extensive" and a "dangerous offender." Tenn. Code Ann. § 40-35-115(b)(2), (4). The trial court also considered the severity of the offenses and whether consecutive sentencing was necessary to protect the public from the defendant's future criminal conduct. The trial court found the defendant could not be sufficiently punished for the offenses, and the public could not be adequately protected absent consecutive sentencing.

The defendant's presentence report indicates he has two prior felony convictions and four prior misdemeanor convictions during the seven years preceding his sentencing hearing. We conclude the evidence was sufficient to support the trial court's finding that the defendant was "an offender whose record of criminal activity is extensive." *See* Tenn. Code Ann. § 40-35-115(b)(2).

In addition, the trial court properly found the defendant was a "dangerous offender." *See* Tenn. Code Ann. § 40-35-115(b)(4). It noted that the defendant was unresponsive to the victim's pleas and continued to "brutalize" her. The trial court found the defendant's actions indicated he has no regard for human life and "is incapable of living in society." The trial court further met the two Wilkerson requirements in its findings. *See* 905 S.W.2d at 939. We conclude the trial court properly imposed partial consecutive sentences.

## VIII. CONCLUSION

In summary, we conclude the trial court properly denied the motion to suppress the victim's identification testimony and the motion to suppress the defendant's statements to the police. The trial court properly admitted the tape recording of the victim's telephone call to the police and evidence regarding the search of the defendant's vehicle. The defendant's two separate convictions for aggravated rape do not violate double jeopardy, and his conviction for aggravated burglary does not violate due process. The defendant's sentences are not excessive, and the trial court properly

imposed partial consecutive sentences.  Therefore, we affirm the judgment of the trial court in all respects.


_____
JOE G. RILEY, JUDGE